IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ELIZABETH LEBRON,      §
     §
     Plaintiff,      §
     §
V.      §      CIVIL ACTION NO. H-05-3519
     §
JO ANNE BARNHART,      §
COMMISSIONER OF THE      §
SOCIAL SECURITY      §
ADMINISTRATION,      §
     §
     Defendant.      §

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 10), Defendant's Motion for Summary Judgment (Document No. 11) and Brief in Support thereof (Document No. 12), and Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 16).  After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, the Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, Defendant's Motion for Summary Judgment (Document No. 11) is GRANTED, and the decision of the Commissioner is AFFIRMED.

## I.  Introduction and Background

Plaintiff Elizabeth Lebron ("Lebron") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for

disability insurance benefits ("DIB").  According to Lebron, substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Thomas G. Norman, committed errors of law when he found Lebron retained the residual functional capacity ("RFC") to perform her past relevant work as a personal attendant (home health worker) as ordinarily performed in the national economy, as well as certain unskilled light jobs existing in the national economy.  (Tr. 20-21).[1]  Lebron contends the ALJ erred in his formulation of her RFC by (1) failing to address her upper extremity limitations in accordance with Social Security Ruling ("SSR") 96-8p; (2) by not enlisting the aid of a medical expert; and (3) by failing to pose a complete hypothetical to the vocational expert at the hearing.  (Document No. 10).  Lebron seeks an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claim for further proceedings.  The Commissioner responds there is substantial evidence in the record to support the ALJ's decision that Lebron was not disabled as a result of her impairments, that the decision comports with applicable law, and that it should, therefore, be affirmed.

## II. Administrative Proceedings

On February 11, 2003, Lebron filed for DIB under Title II of the Social Security Act, claiming an inability to work beginning on May 20, 1997, as a result of arthritis, back pain, problems with the jaw and legs, swelling of the hands and knee, and stiffness of the neck.  (Tr. 14, 28). Lebron also claimed depression, severe headaches, and carpal tunnel syndrome played a role in her disability.  (Tr. 73).  Lebron was last insured for disability benefits on December 31, 2002.  (Tr. 68). The Social Security Administration denied her application at the initial and reconsideration stages. (Tr. 31, 42).  On June 5, 2003, Lebron requested a hearing before an ALJ.  (Tr. 28).  The Social Security Administration granted her request, and the ALJ, Thomas G. Norman, held a hearing on

---

[1] "Tr." refers to the transcript of the administrative record.

February 1, 2005, wherein he considered Lebron's claims.  (Tr. 514).  On February 11, 2005, the

ALJ issued a decision finding Lebron was not disabled on or before the date she was last insured.[2]

(Tr. 14-22).

Lebron sought review of the ALJ's adverse decision with the Appeals Council.  (Tr. 10).

The Appeals Council will grant a request to review an ALJ's decision if any of the following

circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an

---

[2]  The ALJ made the following findings:

1.  The claimant met the special earnings requirements of the Social Security Act on May 20, 1997, the date she stated she became disabled, and continued to meet them through December 31, 2002.

2.  The claimant has not engaged in substantial gainful work since the alleged onset date of disability.

3.  On and prior to December 31, 2002, the claimant had degenerative disc disease and depression, but these impairments did not meet or equal in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's testimony was not fully credible or consistent with the record considered as a whole.

5.  On and prior to December 31, 2002, the claimant had the residual functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally and alternate sitting and standing at will throughout an 8 hour workday.  She could not climb or work at heights or around moving or dangerous equipment.  She was limited to low stress tasks.

6.  On or prior to December 31, 2002, the claimant had the residual functional capacity to perform her past relevant work as a personal attendant (home health worker).

7.  As of December 2002, the claimant was 53 years of age, defined as an individual closely approaching advanced age.

8.  The claimant has a limited education.

9.  The claimant does not have skills that readily transfer to jobs within her residual functional capacity.

10. Based on the testimony of the vocational expert, and using Rule 202.11, Appendix 2, Subpart P, Regulations No. 4 as a framework for decision making, jobs that the claimant was able to perform on and prior to December 31, 2002, existed in significant numbers in the national economy.  Examples of such unskilled light jobs include production line attendant, ticket taker, and cleaner/polisher.

11. The claimant was not under a "disability" as defined in the Social Security Act, as of or prior to December 31, 2002.  (Tr. 21).

error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. § 404.970(a) (2004); 20 C.F.R. § 416.1470(a) (2004). After considering Lebron's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on August 26, 2005, that there was no basis upon which to grant Plaintiff's request for review. (Tr. 5). The ALJ's findings and decision thus became final.

Lebron filed a timely appeal of the ALJ's decision and a Motion for Summary Judgment. (Document No. 10). The Commissioner filed a cross-motion for Summary Judgment (Document No. 11) to which Lebron filed a response (Document No. 16). This appeal is now ripe for ruling.

## III.  Standard of Review of an Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Title 42, Section 405(g) limits judicial review of the commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g) (2004). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985).

Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct 1420, 1427 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct 206, 217 (1938)). Substantial evidence is "more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (citing *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973); *Payne v. Weinberger*, 480 F.2d 1006 (5th Cir. 1973)).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2003). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3) (2003). The impairment must be so severe as to limit the claimant such that:

> [Sh]e is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work.

42 U.S.C. § 423(d)(2)(A) (2003). The mere presence of an impairment is not enough to establish

that one is suffering from a disability.  Rather, a claimant is disabled only if [s]he is "'incapable of engaging in *any* substantial gainful activity.'"  *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

> The Commissioner applies a five-step sequential process to decide disability status:
>
> 1. If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2. If the claimant does not have a "severe impairment" or combination of impairments, [she] will not be found disabled;
>
> 3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
>
> 4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
>
> 5. If the claimant's impairments prevent [her] from doing any other substantial gainful activity, taking into consideration [her] age, past work experience, and residual functional capacity, [she] will be found disabled.

20 C.F.R. §§ 404.1520, 416.920; *Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this process, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work.  *Id.*  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Using the five-step analysis set forth in *Anthony v. Sullivan*, the ALJ determined that Lebron was not disabled within the meaning of the Act.  954 F.2d at 293.  At step one, the ALJ found that

Lebron "has not engaged in substantial gainful work since the alleged onset date of the disability." (Tr. 21).  At steps two and three, the ALJ found that Lebron's degenerative disc disease and depression "did not meet or equal in severity the requirements of any of the medical listings in Appendix 1, Subpart P, Regulations No. 4."  (Tr. 21).  At step four, the ALJ found that Lebron "had the residual functional capacity to perform her past relevant work as a personal attendant (home health worker)."  (Tr. 21).  The ALJ additionally found, based on the testimony of a vocational expert, that as of December 31, 2002, Lebron could perform other unskilled light work as it existed in the national economy, such as a production line attendant, ticket taker, and cleaner/polisher.  (Tr. 21).  This Court must determine whether substantial evidence supports the ALJ's findings.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Facts

The medical records show that Lebron suffers from degenerative disc disease and depression, as documented prior to December 31, 2002.[3]  (Tr. 14-15).  Lebron claims that she has been unable to work since May 20, 1997.  (Tr. 14).

In March 1991, Lebron pulled several muscles while lifting a crib on the job.  (Tr. 170).  A

---

[3]Lebron has not raised any issue in this appeal challenging the ALJ's findings relative to any of her impairments other than her upper extremity limitations (including her alleged carpal tunnel syndrome) in combination with her degenerative disc disease (neck pain and limited range of motion associated with the cervical spine).  As a result, other impairments will not be discussed or addressed at length herein except as necessary.

MRI showed she had "a central disk protrusion at C4-5 and a central bulge at C6-7 without any foramenal [sic] stenosis or cord compromise."  (Tr. 170).

In April 1992, Lebron began visiting Dr. Helen M. Schilling, M.D., D.D.S.  (Tr. 170).  Dr. Schilling conducted sensory and muscle testing, noting that while both results were within normal limits, Dr. Schilling was under the impression that Lebron had right C4-5 radiculopathy.  (Tr. 171). Around this time, Lebron began trigger point therapy injections to ease her pain.  (Tr. 171).  Lebron re-injured the same muscle group in 1993, and Dr. Schilling prescribed additional trigger point therapy.  (Tr. 167).  On February 6, 1998, because Lebron's insurance carrier would no longer approve the trigger point injections, Dr. Schilling prescribed Zoloft for "pain and improved sleep." (Tr. 154).  In her March 20, 1998, visit note, Dr. Schilling clarified her October 17, 1997, office note that Lebron was not working due to pain.  (Tr. 153).  By September 17, 1998, Dr. Schilling had prescribed Lebron several medications for pain, such as Ultram and Neurontin.  (Tr. 151).

On November 6, 1998, Lebron began visiting Dr. C.T. Judy Dai, M.D., a pain management specialist.  (Tr. 350).  Dr. Maninder S. Guram, a gastroenterologist , had referred Lebron to Dr. Dai. (Tr. 350).  Dr. Dai recorded Lebron's chief complaint as "abdominal pain," performed a physical examination, and conducted radiological imaging of the abdomen and pelvis.  (Tr. 350-51).  Dr. Dai's initial impression was Lebron had neck pain, lower back pain, anxiety, depression, and arthritis.  (Tr. 351).  According to Dr. Dai's notes from this visit, Lebron was taking Premarin, Prilosec, Dicyclomine, Hyoscyamine, Ultram, Neurontin, Lorazepam [sic], and Klonopin.  (Tr. 350). Dr. Dai prescribed Vicodin for pain relief.  Her record, however, does not indicate whether she discontinued any of the other medications.  (Tr. 352).  On March 3, 1999, Dr. Dai opined that Lebron would benefit from trigger point injections for the neck.  (Tr. 346).  A few weeks later, Dr. Dai proceeded with the trigger point injections and prescribed Valium for sleep.  (Tr. 345).  Also, according to Dr. Dai's treatment note, a psychiatrist prescribed Remeron for Lebron's depression.

(Tr. 345).  On April 13, 1999, Dr. Dai noted that Lebron asked for stronger pain medicine, but Dr. Dai refused Lebron's request, and refilled her prescriptions for Vicodin and Valium instead.  (Tr. 344).  On May 19, 1999, Dr. Dai administered an EMG/nerve conduction test.  (Tr. 343).  The results of the test showed bilateral C5 radiculopathy, bilateral L4, L5 and S1 nerve root irritation, and right L5-S1 radiculopathy.  (Tr. 343).  Based on the test results, Dr. Dai scheduled Lebron for selective nerve block and facet joint injections, and refilled Lebron's pain medication prescriptions.  (Tr. 343).  On July 16, 1999, Dr. Dai suspected that Lebron's complaints of "bad headaches" were probably due to her neck problems, but scheduled an MRI of the brain.  (Tr. 338).  The procedure resulted in normal findings.  (Tr. 337).  On August 6, 1999, Dr. Dai administered trigger point injections to the neck and thoracic back and refilled Lebron's Vicodin prescription.  (Tr. 337).  At Lebron's next appointment on September 3, 1999, Lebron continued to complain of neck pain.  (Tr. 336).  Because Dr. Dai suspected neurological involvement in Leborn's thoracic and lumbar spine, she recommended that Lebron undergo an MRI and x-ray.  (Tr. 336).  The record does not indicate whether Lebron underwent the recommended procedures at that time.  Lebron received additional trigger point injections on November 10, 1999, and saw Dr. Dai again about a month later, when Dr. Dai recommended more trigger point injections.  (Tr. 335).

In a treatment note dated November 10, 2000, a physician (presumably Dr. Dai) wrote that Lebron "did not want to do physical medicine."  (Tr. 334).  On January 10, 2001, the same doctor noted that Lebron needed another MRI and x-ray of the cervical spine.  (Tr. 333).  In the physician's opinion, Lebron seemed depressed.  (Tr. 333).  On February 20, 2001, Lebron underwent a MRI of the cervical spine.  (Tr. 313-14).  Dr. Arlene Marx, M.D., opined that Lebron had significant foraminal narrowing at C6-7, on the right side.  (Tr. 313).

Given that the MRI taken on February 20, 2001, revealed C2-3, C3-4, C4-5, and C6-7 bulging and protrusion as well as "foramenal [sic] encroachment, as well as facet arthropathy

involving multiple levels," and given the results of the physical exam, Dr. Dai opined: "[d]egenerative joint and disk disease of the cervical spine with recent exacerbation. The patient does have worsening symptoms with equivocal findings on sensory examination. On the motor exam the patient appears to be worse than before." (Tr. 331-32). Dr. Dai refilled Lebron's prescriptions, recommended that she undergo cervical epidural steroid injections, and EMG nerve conduction studies "to delineate the exact nerve and muscle involvement in the upper extremities." (Tr. 332). The results of Dr. Dai's March 16, 2001, physical examination of Lebron showed normal reflexes, a "somewhat" lack of effort in the motor examination, and an otherwise normal range of motion except for a decreased right shoulder abduction. (Tr. 331). A physician (presumably Dr. Dai) refilled the prescriptions on May 11, 2001, noting neck and trapezius pain. (Tr. 330). On October 10, 2001, the same doctor noted that Lebron no longer had insurance. (Tr. 329). According to the treatment note, Lebron complained of neck pain and headaches. (Tr. 329). Her prescriptions were refilled. (Tr. 329). On October 26, 2001, Lebron received trigger point injections and a prescription refill. (Tr. 323). On November 28, 2001, Lebron again received trigger point injections. (Tr. 327). Her chief complaints concerned her neck and shoulders. (Tr. 327).

On August 16, 2002, Lebron's chief complaints were neck and back pain, which radiated to her shoulders and down to her legs. (Tr. 326). Dr. Dai's impressions were chronic neck pain and depression. (Tr. 326). Dr. Dai refilled her prescriptions and recommended Effexor XR. (Tr. 326). Dr. Dai noted a decreased range of motion at the right shoulder, a lack of sensitivity to pinprick, and motor results of 4/5, but again noted a lack of effort on Lebron's part. (Tr. 326). On August 23, 2002, Lebron received trigger point injections. (Tr. 325). On October 4, 2002, Lebron received more trigger point injections. (Tr. 324). The doctor again noted an overall impression of chronic neck pain and depression. (Tr. 324). On November 19, 2002, Dr. Dai administered trigger point injections and added myofascial pain syndrome to the overall impression of Lebron's condition. (Tr.

10

323).  On January 3, 2003, Lebron received trigger point injections and refilled her prescriptions. (Tr. 322).

On January 21, 2003, regarding Lebron's neck pain, Dr. Dai noted that the physical examination had not changed in six months.  (Tr. 321).  She commented that Lebron appeared very depressed, noting this had been ongoing for "many, many years."  (Tr. 320).  Dr. Dai recommended that Lebron undergo a psychiatric and psychological consultation.  (Tr. 320-21).  Dr. Dai went so far as to suggest Lebron consider filing for disability benefits.  (Tr. 321).  In her February 2, 2003, "EMG/NVC of Upper Extremities" notes, Dr. Dai believed her study to be consistent with "1) Mild bilateral median nerve entrapment at the wrist.  (Mild bilateral carpal tunnel syndrome). 2) Cervical radiculopathy involving right C6/C7 nerve root. . . . 3) Cervical nerve root irritation involving bilateral C4/C5 level."  (Tr. 311).

The record shows that Dr. Dai referred Lebron to Dr. Phylliss M. Chappell, M.D. at Healthsouth Diagnostic Center Willowbrook on February 11, 2003.  (Tr. 312).  In a "Two View Cervical Spine Series," Dr. Chappell noted a clinical history of neck pain, but found that "the vertebral body heights are well maintained and the prevertebral soft tissues are normal."  (Tr. 312). However, there was at C4-5, C5-6, C6-7 "[s]pondylosis, right uncinate hypertrophy, and C4-5 and C6-7 intervertebral disc height loss."  (Tr. 312).  With respect to the results of Lebron's MRI, Dr. Chappell noted degenerative disc dessication and disc bulges in C3-4, C4-5, C5-6, and C6-7 and mild degenerative disc dessication of C7-T1.  (Tr. 302).  There was neural foraminal stenosis in C3-4, C4-5, C5-6, and C6-7 of varying degrees.  (Tr. 302).

On March 28, 2003, Dr. Dai completed an "Arthritis Residual Functional Capacity Questionnaire" for Lebron.  (Tr. 442-46).  Dr. Dai opined that Lebron has "chronic neck pain due to degenerative discs, depression, [and] carpal tunnel syndrome."  (Tr. 442).  Dr. Dai did not believe Lebron to be a malingerer, but circled "yes" in response to a question which asked "[d]o emotional

11

factors contribute to the severity of your patient's symptoms and functional limitations." (Tr. 443). Among the psychological conditions affecting pain, Dr. Dai circled "depression." (Tr. 443). When asked to "indicate how long [her] patient could sit and stand/walk total *in an 8-hour working day* (with normal breaks)," Dr. Dai selected none of the options given and instead wrote "can't work 8 hours." (Tr. 444). When asked "[d]oes your patient have *significant limitations* in doing *repetitive* reaching, handling or fingering?" Dr. Dai answered "yes." (Tr. 445). Dr. Dai indicated Lebron had zero percent capability in both hands to grasp, turn, or twist objects, zero percent capability in fine finger manipulations, and zero percent capability in arm reaching (including overhead). (Tr. 445).

On April 10, 2003, Dr. Dai completed a "Listing §104.A–Spinal Nerve Root Compression" questionnaire. (Tr. 447-48). Dr. Dai identified Lebron's disorder of the spine as "degenerative discs [sic] cervical spine." (Tr. 447). When asked if patient had muscle weakness, Dr. Dai responded that on a zero to five grading system, "[a]ll muscles of the upper extremities–4/5" were affected. (Tr. 447). Dr. Dai described Lebron's "sensory *or* reflex loss" as "all over (overall in sensitivity)." (Tr. 448).

On the same day, Dr. Dai completed a "Cervical Spine Residual Functional Capacity Questionnaire." (Tr. 449). Dr. Dai noted that Lebron's left shoulder and posterior neck hurt all the time and the pain was exacerbated with all activities. (Tr. 450). She noted the severity as a six out of ten. (Tr. 450). Again, Dr. Dai noted that depression affected Lebron's physical condition. (Tr. 451). Dr. Dai believed Lebron to be "incapable of even 'low stress' jobs." (Tr. 451). On the side of the fourth page, Dr. Dai wrote out "she can't work 8 hours–patient cannot work at all" instead of completing the remainder of the questionnaire. (Tr. 452).

Lebron also visited Dr. Magdy K. Tadros, M.D. for general purposes from 1997 through 2002. (Tr. 109). Besides a few comments concerning Lebron's back pain, Dr. Tadros did not mention any major upper extremity abnormalities in her reports. (Tr. 354-78).

12

In this case, the objective medical evidence does not support the conclusion that Lebron is disabled. While the objective medical evidence reveals that Lebron endures pain and has some functional limitations, particularly with respect to her range of motion, such limitations are not *per se* disabling. Accordingly, the objective medical evidence factor weighs in favor of the ALJ's decision.

### B. Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981). Furthermore, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'" *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)). "'The opinion of a [medical] specialist generally is accorded greater weight than that of a non-specialist.'" *Newton*, 209 F.3d at 455 (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)). "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). Further, regardless of the opinions and diagnoses of medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez*, 64 F.3d at 176 (quoting *Moore v. Sullivan*, 919 F.2d 901,

905 (5th Cir. 1990)).

The Social Security Regulations provide a framework for the consideration of expert medical opinions of a claimant's treating physician.  Under 20 C.F.R. § 404.1527(d)(2), consideration of a treating physician's opinion must be based on:

1.      the physician's length of treatment of the claimant,

2.      the physician's frequency of examination,

3.      the nature and extent of the treatment relationship,

4.      the support of the physician's opinion afforded by the medical evidence of record,

5.      the consistency of the opinion with the record as a whole, and

6.      the specialization of the treating physician.

*Newton*, 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id*.  The Social Security Regulations provide further guidance on this point as well:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record only means that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 61 Fed. Reg. 34490 (July 2, 1996).  With regard to the weight given "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. § 404.1527. . ., providing appropriate explanations for accepting or rejecting such opinion." *Id*.

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R.

§ 404.1527(d).  *Newton*, 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons

set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455.

   *1.  Upper Extremity Limitations*

   Lebron argues that "the ALJ erred in that, while assessing Plaintiff's cervical discogenic

disorder, he failed to address the obvious upper extremity limitations that were secondary to that

disorder, thus violating Social Security Ruling (SSR) 96-8p."  Lebron states that SSR 96-8p requires

the ALJ "to articulate all of the relevant findings that support a functional capacity, to delineate that

functional capacity precisely, function-by-function, and to explain how the particular finding either

supports or refutes the functional capacity element in question."  (Document No. 10).  Although SSR

96-8p requires the RFC assessment of work-related abilities to be made on a function-by-function

basis, it does not require the assessment to take into account impairments not backed up by medical

evidence.

   Lebron claims that the genesis of her upper-extremity limitations is documented before her

insured status expired on December 31, 2002, and that the medical records support her  claim.

While it is true that in March, 2001, Dr. Dai noted disk bulging and protrusion in the cervical spine,

and decreased muscle strength, she nonetheless attributed the test results to a lack of effort by

Lebron.  (Tr. 331).  Based on Dr. Dai's March 28, 2003, "Arthritis Residual Functional Capacity

Questionnaire,"  Lebron claims she saw Dr. Dai "monthly since November 6, 1998—several years

before the date last insured ("DLI")—and that, among other conditions, Plaintiff had been diagnosed

with carpal tunnel syndrome."  (Document No. 10) (citations omitted).  The ALJ considered other

RFC assessments completed by Dr. Dai wherein the physician stated Lebron was not capable of low

stress jobs, could not work an eight-hour workday, and could not work at all for that matter.  (Tr.

442-53).

   Below, the ALJ's decision demonstrates that he carefully considered Dr. Dai's treatment

records with regard to Lebron's physical complaints:

> The undersigned considered the Residual Functional Capacity Questionnaires by Dr. Dai dated April 2003 (after the date the claimant was last insured for benefits) indicating that the claimant could not work 8 hours (Exhibit B19F). In support of his [sic] assessment Dr. Dai referred to chronic neck pain due to degeneration of discs, depression, and carpal tunnel syndrome. The medical records document radiographic studies that showed degenerative disc disease of the cervical neck. However, the neurological examinations revealed essentially normal findings. Although Dr. Dai stated that the claimant's examinations revealed sensory changes, reflex changes, and muscle weakness, as set out in the summary above, the claimant's examinations revealed intact sensation, equal reflexes, and normal or close to normal muscle strength. When there was decreased muscle strength it was thought to be due to a lack of effort. Although Dr. Dai referred to carpal tunnel syndrome in support of his [sic] assessment, there was no documentation of this impairment on or prior to December 31, 2002, the period at issue in this case. Further, although the claimant was diagnosed with carpal tunnel syndrome just a few months after December 2002, this condition was described as mild in degree. In addition, it is a treatable condition requiring only a short recuperative period. Although Dr. Dai stated that the claimant was incapable of even low stress jobs, the medical records indicate that the claimant was given a global assessment of functioning of 60 on the two occasions when mental status examinations were performed, and this assessment is consistent with an ability to perform low stress work. Although Dr. Dai stated that the claimant was unable to concentrate, the mental status examinations revealed that she had a fair ability to concentrate.

> The regulations state that if a treating source's opinion on the issue of the nature and severity of a claimant's impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record, the opinion will be given controlling weight (20 CFR 404.1527). Because Dr. Dai's assessment is not consistent with objective clinical findings and the evidence of record considered as a whole, the undersigned is not required to give the assessment controlling weight in the evaluation of this case.

(Tr. 17-18).

The ALJ's opinion is in line with the considerations set forth in 20 C.F.R. § 404.1527(d)(2). Despite the record's demonstration that Dr. Dai treated Lebron on a regular basis since 1998, the ALJ noted the inconsistencies of Dr. Dai's Spring 2003 RFC assessments with the rest of the record as a whole. For example, the ALJ points to the state agency reviewing physician's evaluation of Lebron completed around the same time Dr. Dai completed her post-DLI RFC assessments. (Tr. 17, 393-400). The physician opined that Lebron could "lift and carry 25 pounds frequently and 50

16

pounds occasionally, stand and/or walk about 6 hours of an 8 hour workday, sit about 6 hours of a workday, and climb, balance, stoop, kneel, crouch, and crawl without limitations." (Tr. 17, 394-95).

In her motion for summary judgment, Lebron contends that diagnostic imaging pre-dating her DLI by more than a year concerning her degenerative disc disease demonstrates "[a] cervical radiculopathy at these levels [with] symptoms very similar to, and . . . similar limitations as, carpal tunnel syndrome." However, the ALJ, to whom this Court defers, determined that "the claimant's examinations did not reveal any significant neurological deficits" that manifested the severity required by section 1.04 in Appendix 1, Subpart P, Regulations No. 4 before December 31, 2002. (Tr. 15).

Further, in *Frank v. Barnhart*, the Court considered the differences as set forth in the Code of Federal Regulations between a doctor's opinion of the nature and severity of a claimant's impairment and a doctor's opinion on disability status or functional capacity. 326 F.3d 618, 620 (5th Cir. 2003). The regulations at 20 C.F.R. § 404.1527(e)(1) explain that the final responsibility for deciding issues regarding a claimant's RFC or disability status is reserved to the Commissioner and "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled." Therefore, this Court finds no error of law in the ALJ's assessment of Lebron's alleged upper-extremity limitations.

### 2. The Lack of a Medical Expert

Lebron next contends that "the ALJ erred in failing to enlist the aid of an appropriately trained medical expert ("ME"), thus violating the injunction in *Manso-Pizarro v. Secretary of Health and Human Services*, 76 F.3d 15, 17 (1st Cir. 1996) and *Berrios Lopez v. Secretary of Health and Human Services*, 951 F.2d 427, 431 (1st Cir. 1991). Lebron relies on *Manso-Pizarro*, for the proposition that "[w]ith a few exceptions (not relevant here), an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." 76 F.3d at 17. Similarly, in *Berrios Lopez*, the First

Circuit stated that "[s]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess claimant's residual functional capacity based on the bare medical record." 951 F.2d at 430.  Based on these cases, Lebron's claim that the ALJ was *required* to consult an ME is without merit.  The ALJ's decision was not based on an interpretation of raw or bare medical data.  Here, more than one physician issued an assessment of Lebron's condition.

Furthermore, the regulations state that the ALJ *may* ask for and consider the opinion of a medical expert about the nature or severity of a claimant's impairment, but the ALJ is not *required* to do so.  20 C.F.R. §§ 404.1527(c)(3), 404.1527(f)(2)(iii).  The Commissioner also correctly notes that the ultimate decision regarding the claimant's disability status and RFC lies with the ALJ, not the opinion of a medical expert, if consulted.  *Frank*, 326 F.3d at 620; 20 C.F.R. § 404.1527(e)(1).

Here, the ALJ did not err in not consulting a medical expert.  Lebron agrees that it is not always error to not consult a medical expert, "[b]ut in *this* case, given the subtlety of the signs in the record, and the requirement properly to assess the resulting limitations in formulating an RFC, the ALJ failed to develop the case." (Document No. 16).  Again, the ALJ did not find Lebron's upper-extremity limitations met the severity requirements set forth in section 1.04, Appendix 1, Subpart P, Regulations No. 4 before December 31, 2002. (Tr. 15).  Accordingly, upon this record, the ALJ's decision is in line with the requirements of the Social Security Regulations.

### C.  Subjective Evidence

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled.  *Cook v. Heckler*, 750, F.2d 391, 395 (5th Cir. 1985).  42 U.S.C. § 423 provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing

the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or her physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423(d)(5)(A). "Pain constitutes a disabling condition under the SSA [Social Security Act] only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hams v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

At the ALJ hearing, Lebron testified that at the onset of her disability she was in constant pain in her arms, legs and back. (Tr. 516). She further testified that her problems have since become worse and the medications doctors gave her to remedy such problems made her depressed and tired. (Tr. 517). She claimed she could not drive due to her left leg, panic attacks, and neck pain. (Tr. 517). She testified that her husband has to help her with her daily activities and on some days her medications do not allow her to get out of bed. (Tr. 517). Her husband then testified that Lebron's health had been going "downhill" and he has to do all of the housework. (Tr. 519).

The ALJ found Lebron's testimony not fully credible. Credibility determinations, such as the one by the ALJ in this case, are generally within the province of the ALJ. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). The court finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony

19

improperly.  *See Leggett v. Chater*, 67 F.3d 558, 565 n.12 (5th Cir. 1995) ("It is appropriate for the

court to consider the claimant's daily activities when deciding the claimant's disability status.").

Based on the record, there are inconsistencies between Lebron's subjective complaints and the

objective medical evidence.

The ALJ wrote:

The claimant described her disabling conditions as arthritis, back pain, problems
with the jaw and legs, swelling of the hands and knee, and stiffness of the neck.  She
was asked how her conditions kept her from working, and she responded that she
experienced pain all the time and could hardly move her neck and hands.  (Exhibit
BE39).

The claimant alleged disability due to arthritis, and she was given a referral to
Rheumatology based on her complaints (Exhibit B8F, page 6).  The claimant had a
negative rheumatoid factor test and negative anti-nuclear antibodies test (Exhibit
B18F, page 18).  The claimant had both an elevated sedimentation rate and normal
sedimentation rate (Exhibit B5F, page 5; Exhibit B18F, page 16).  This is a non-
specific test.  The claimant was diagnosed with muscular aches and pains with some
arthralgia complaints (Exhibit B3F, page 5).  The claimant stated that she was not on
any medications (Exhibit BE50).  If the pain were as severe as alleged, she would be
taking medications.

The claimant's doctor stated in September 1998 that the etiology of the claimant's
back pain was unclear (Exhibit B3F, page 3).  A report dated November 1998
reflects that the doctor stated that there seemed to be a strong psychosomatic
component to the claimant's complaint of pain (Exhibit B11F, page 53).  These
reports support a conclusion that the claimant's allegations are exaggerated.

The claimant alleged disability due to problems with the jaw, and there are
references to TMJ (Exhibit B5F, pages 9 and 13; Exhibit B6F, page 3; Exhibit B8F,
page 12; Exhibit B11F, pages 40 and 48).  There are no findings to support a
conclusion that this is a disabling impairment.

Although the claimant alleged disability due to swelling of the hands and knee, there
are no objective clinical findings to support those allegations.

The claimant was diagnosed with fibromyalgia (Exhibit B5F, page 12; Exhibit B8F,
page 8) and possible fibromyalgia (Exhibit B11F, page 48).  According to the
American College of Rheumatology, to meet diagnostic criteria for a diagnosis of
fibromyalgia, an individual must have widespread pain in all four quadrants of their
body for a minimum duration of three months and at least 11 of the 18 specified
tender points.  These 18 sites used for diagnosis cluster around the neck, shoulder,
chest, hip, knee, and elbow regions.  <u>Arthritis and Rheumatism Journal</u>, copyright

1990.  There is no evidence that the claimant's examinations revealed 11 of the 18 specific tender points.

The claimant was asked if her physical problems limited her ability to perform 19 specific activities, and she responded in the affirmative to 17 of the activities with no response to the other two activities (speaking and using the phone) (Exhibit BE37).  The claimant's responses to the question support a conclusion that her allegations are exaggerated.

The claimant was asked to describe an average day, and she responded that she got up in the morning and moved around (Exhibit BE38).  The claimant's answer was unresponsive.

The claimant's earnings record documents somewhat sporadic earnings over the years, a factor that could suggest a lack of motivation to work.

Due consideration has been given to credibility, motivation, the objective medical evidence and opinion, clinical and laboratory findings, diagnostic tests, the extent of medical treatment and relief from medication and therapy, the claimant's daily activities, the extent, frequency, and duration of symptoms, attempts to seek relief from symptoms, the claimant's earnings record, and all of the evidence of record considered as a whole.  The undersigned Judge finds that the claimant's subjective symptoms are of only a mild to moderate degree and tolerable for the level of work, residual functional capacity and work limitations as found herein; and the claimant's subjective complaints are found not to be fully credible but somewhat exaggerated.

(Tr. 18-19).

Upon this record, the ALJ identified such inconsistencies in the record and gave specific reasons for rejecting Lebron's subjective complaints, giving due consideration to "credibility, motivation, the objective medical evidence and opinion . . . the extent of medical treatment and relief from medication and therapy, the claimant's daily activities, the extent, frequency, and duration of symptoms, attempts to seek relief from symptoms . . . and all of the evidence of record considered as a whole." (Tr. 19).  The ALJ reasoned that Lebron's somewhat sporadic earnings over the years could suggest a lack of motivation to work.  (Tr. 19).  He also noted that there are no objective clinical findings to support the claimant's disability due in part to swelling of the hands and knee.  (Tr. 19).  Further, the ALJ referenced two reports in the Fall of 1998, wherein one of Lebron's physicians was unclear about the etiology of her back pain.  (Tr. 174).  The second report was

completed approximately two months later by Dr. Dai, who noted that there seemed to be a "strong psychosomatic component" to Lebron's abdominal pain complaints.  (Tr. 351).

Given the ALJ's supported and reasoned credibility determinations, which will not be disturbed on appeal, the subjective evidence factor also weighs in favor of the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history, and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'"  *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).

Lebron claims that:

The ALJ erred in failing to pose to the vocational expert ("VE") a complete and hypothetical question and then in basing his decision upon the VE's necessarily flawed response to that incomplete hypothetical. . . . [and] in failing to reconcile the discrepancy between the testimony offered by the VE and the information contained in the <u>Dictionary of Occupational Titles</u> ("DOT"), Fourth Edition, Revised 1991, thus violating the instructions in SSR 00-4p.

(Document No. 10).

Lebron believes that the ALJ did not pose a complete hypothetical to the vocational expert because he did not incorporate consideration of her upper-extremity limitations.  Because the ALJ did not find Lebron's RFC was restricted by any upper-extremity limitations, he properly excluded

the alleged impairments from the hypothetical question posed to the vocational expert based on a lack of objective medical evidence.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (1985).

Upon this record, substantial evidence supports the ALJ's use of the Medical Vocational Rules (the "Grids") and the ALJ's finding that Lebron was not disabled.  Use of the Grids is appropriate when a rule accurately describes an individual's capabilities and vocational profile. *Heckler v. Campbell*, 461 U.S. 458, 462 & n.5 (1983).  The Grids are used "when it is established that a claimant suffers only from exertional impairments, or the claimant's nonexertional impairments do not significantly affect [her] residual functional capacity."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999).

As of her date last insured, Lebron was fifty-three years old, able to perform limited light work, possessed a limited education, but could not communicate in English.  (Tr. 20).  Given findings, the ALJ then applied Medical-Vocational Rule 202.11, Appendix 2, Subpart P, Regulations No. 4 as a framework for decision-making and noted that although Lebron could not perform a full range of light work, the vocational expert's hypothetical person could perform unskilled light jobs such as production line attendant, ticket taker, and cleaner/polisher.  (Tr. 20).  These jobs exist in the regional and national economy in significant numbers.  (Tr. 20).

Finally, Lebron contends that her past relevant work was incorrectly characterized by the vocational expert.  The vocational expert classified the job as "light . . . as ordinarily performed in the national economy."  (Tr. 19, 521).  Lebron claims that the DOT classification of such work as medium in exertion should be applied to her case.  However, a claimant will be found capable of performing her past relevant work if she can perform that work as she actually performed it, or as it is generally performed in the national economy.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  "ALJs may *take notice* of job data in the [DOT], which reflects the exertional requirements of a job as performed in the national economy."  *Id.* (emphasis added).  There is no case law which

suggests that the DOT description is the only source an ALJ may weigh in deciding a claimant's disability status. Further, Lebron has the burden of proof regarding her performance of former work. *Id.* at 1023. The ALJ properly considered the evidence before him, and considered the vocational expert's testimony as credible as to this matter.

This factors further supports the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the undersigned is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directs a finding of "not disabled" on these facts. *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982). As all the relevant factors weigh in support of the ALJ's decision, and as the ALJ used the correct legal standards, the Court

ORDERS that the Plaintiff's Motion for Summary Judgment (Document No. 10), is DENIED, Defendant's Cross-Motion for Summary Judgment (Document No. 11) is GRANTED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 22nd day of December, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE